UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TAMARAH NORTON,<br><br>        Plaintiff,<br><br>v.<br><br>ARCHETYPE CONSULTING, INC., JASON WEBSTER, MAX GOMEZ, and ANDY SCHLOSBERG,<br><br>        Defendants. | CIV. NO. 1:20-CV-11299-GAO<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

### Introduction

Plaintiff Tamarah Norton ("Norton"), by her attorneys, Whitney Law Group, LLC, hereby amends her complaint in this action and seeks damages against her former employer, Archetype Consulting, Inc. ("ACI"), and three senior executives of the company, Jason Webster ("Webster"), Max Gomez ("Gomez"), and Andy Schlosberg ("Schlosberg"), (collectively "Defendants") based on ACI's failure to pay Norton her earned wages in violation of the Massachusetts Wage Act (the "Wage Act"), M.G.L. c. 149, § 148. In addition to claims under the Wage Act, Norton also asserts several common law claims all arising from Defendants' failure to pay her wages and/or unfairly underpaying Norton in a manner at odds with promises made by Archetype. The haphazard manner in which ACI approached its wage payment obligations to Norton demonstrates a cavalier disregard for the Wage Act.

### PARTIES

1. Norton is an individual residing at 8275 Varenna Drive, Sarasota, FL 34231 and is a citizen of Florida.

2. ACI is a Massachusetts corporation with its principal place of business located at 180 Canal Street, Suite 600, Boston, MA 02114 and is a citizen of Massachusetts.

3. Webster is an individual residing at 182 River Road, Hanover, MA 02339 and is a citizen of Massachusetts.

4. Upon information and belief, Gomez is an individual residing at 17 Monument Street, Charlestown, Massachusetts 02129 and is a citizen of Massachusetts.

5. Upon information and belief, Schlosberg is an individual residing at 151 Downer Avenue, Hingham, Massachusetts 02043 and is a citizen of Massachusetts.

## JURISDICTION AND VENUE

6. Jurisdiction is proper in the United States District Court, District of Massachusetts based on diversity jurisdiction, 28 U.S.C. § 1332(a). The parties are diverse in citizenship and the amount in controversy exceeds $75,000.

7. Venue is properly laid within the United State District Court for the District of Massachusetts - Eastern Division, under 28 U.S.C. § 1391, because Defendants reside within the Eastern Division of this judicial district and a substantial portion of events giving rise to the claims set forth herein occurred in this division.

## FACTS

### Employment at Archetype

8. Norton began working at ACI in June 2018.

9. As explained below, Norton's employment at ACI ended involuntarily, during the period of events from June 5, 2020 to June 12, 2020.

10. Norton's last title held at ACI was Senior Vice President, Performance Management Practice Lead.

**Failure to Pay 2018 Performance Bonus**

11. Under the terms of Norton's bonus plan, she was eligible to be paid a bonus for her work performed in 2018 (the "2018 Bonus"). The 2018 bonus was due to be paid by the end of March 2019.

12. Based on her communications with Webster, Norton understood that her full bonus for 2018 would equal $165,000. This was part of their employment negotiations, where Norton informed Webster of the size of her prior bonus. The $165,000 figure was roughly half of Norton's prior bonus, and she was only going to be working at ACI for half of 2018.

13. Several times, ACI confirmed to Norton that she had earned and was entitled to be paid her full ($165,000) bonus based on the revenue numbers she had achieved in 2018. Webster and Courtney Walsh ("Walsh"), an ACI accounting department employee who oversaw bonus and commission payments, separately informed Norton of this fact. Upon information and belief, confirmation that she had earned her full bonus exist in email communications in possession of the company.

14. The bonus plan provides that Norton is not entitled to any incentive payment, except those payments that ACI determines "in its discretion." According to the language of the plan, any definitive bonus amounts that ACI communicates that it determined Norton had earned are, by definition, amounts that were determined in ACI's discretion.

15. Once ACI communicated that it had determined the amount it owed to Norton, that amount became earned wages that were definitely determined, due, and owing to Norton.

16. ACI failed to pay Norton her bonus when it was due at the end of March 2019. Norton was forced to press ACI for payment of her bonus. She did so countless times after March 2019.

17. Webster informed her that the company could not pay the amount she had earned due to cash flow issues and that he was barely making payroll and seeking funding from outside sources to help. However, when claiming cash flow issues Webster always reiterated that she would be paid.

18. Finally, in or about December 2019, ACI made a late payment of $42,000 to Norton. Webster informed Norton that he was paying only $42,000 because of "cash flow" concerns, but again assured her she would receive the remainder.

19. ACI reneged on paying Norton the additional $123,000 that it had previously determined she had earned and ACI owed.

## Failure to Pay 2019 Performance Bonus

20. Under the terms of Norton's bonus plan, she was eligible to be paid a bonus for her work performed in 2019 (the "2019 Bonus"). Applying the formula in the bonus plan, ACI determined that the amount it owed to Norton for her 2019 bonus was $351,653.75.

21. ACI communicated to Norton that it had determined that it owed her $351,653.75 under the bonus plan. By communicating the determination of that specific figure, ACI necessarily had determined -- in its discretion -- the precise amount owed under the plan.

22. Once ACI communicated that it had determined the amount it owed to Norton, that amount became earned wages that were definitely determined, due, and owing to Norton.

23. The 2019 Bonus was due to be paid by the end of March 2020.

24. ACI reneged on its obligation to pay Norton her 2019 Bonus when it was due.

25. Again, just as with her 2018 Bonus, Norton found herself needing to hound ACI to pay her bonus.

26. ACI made a partial payment of Norton's 2019 Bonus in the amount of $50,000 later in or around April 2020.

27. Shortly thereafter, ACI proposed that it pay the remaining bonus owed over an extended period. ACI informed Norton that it intended to sign a promissory note to cover the amount remaining to be paid. Norton objected to the notion of a promissory note and instead demanded cash payment. ACI, however, made it clear to Norton that she did not have any other choice again due to cash flow issues. On or about May 22, 2020, Webster executed a promissory note in the amount of $301,653.75 payable to Norton from September 2020 through the end of 2022.

28. Although Norton was unhappy about having to accept a promissory note, she felt it was better than what had happened to her with respect to the 2018 Bonus. This was the second year in a row that ACI had failed to pay the bonus in a timely manner that it had determined she earned.

29. The promissory note stated specifically that the $301,653.75 remaining amount owed after the late, partial payment of $50,000 in April 2020: "***represent[ed] the total amount owed to [Norton] under the Practice Leader Bonus Plan for the fiscal year ended December 31, 2019 ….***" (Emphasis Added.)

30. At the time she entered into the promissory note, Norton was unaware of the Wage Act's prohibition against special contracts designed to circumvent the law's requirements.

### **Failure to Pay 2020 Quarterly Performance Bonus**

31. Norton's plan that governed 2018 and 2019 expired at the end of 2019.

32. Prior to 2020, ACI was supposed to provide Norton with a new incentive pay plan. ACI failed to do so. Thus, at the start of 2020, Norton had no written plan that governed her incentive-based pay.

33. This absence of a written plan for 2020 was not the result of a lack of trying on Norton's part. On numerous occasions starting in October 2019, Norton sought to engage ACI about the need to issue a new plan for 2020.

34. Through a series of oral statements and written communications, ACI informed Norton that her base pay for the entire year of 2020 would be increased by $50,000 and that the company had determined that she would receive quarterly performance bonuses in the amount of $50,000 each.

35. ACI informed Norton that this new plan would be reflected in a written document, which it did not provide to her until approximately May 2020. It was in this proposed May 2020 plan that ACI changed what it had previously promised to Norton concerning her annual salary for 2020. ACI proposed that her increased salary rate of $350,000 not start until April 1, 2020. This was at odds with prior promises of $350,000 for the full year.

36. The bonus promises made by ACI during 2020 were like a shell game, shifting and confusing to Norton, and ACI ultimately landed on a $150,000 bonus payment payable over three quarters.

37. Norton recalls that at some point prior to her end of employment, ACI had determined and confirmed that she had earned a quarterly 2020 bonus payment of $50,000.

38. ACI later reversed course and told Norton that it decided not to pay her this quarterly 2020 bonus, despite the strong results that Norton had achieved.

39. ACI failed to pay Norton any amount for her quarterly 2020 bonus.

### **Failure to Pay Commissions In A Timely Manner**

40. For the calendar years 2018 and 2019, Norton was entitled to be paid 1.5% of deals that Norton sourced outside of the sales and marketing teams. This obligation is spelled out in the 2018-2019 plan.

41. At some point after she commenced working for ACI, Walsh informed her that the commissions would be paid monthly (like other sales commissions at the company).

42. While discovery will be necessary to obtain documents to demonstrate the precise details, dates, and amounts concerning Norton's commission payments, Norton is certain that did not receive her commission payments in a timely manner.

43. Norton was paid her commissions eventually, but in the vast majority of (if not all) situations, ACI paid her commissions late. In many cases, the commissions were paid months late.

### **Retaliatory Discharge**

44. Throughout calendar year 2019 and 2020, Norton had lost her patience with ACI playing fast and loose with her bonus and commission payments. As a result, she expressed her dissatisfaction with ACI's continued and persistent failure to pay the promised amounts of her 2018 and 2019 bonuses. Norton expressly informed ACI that its failure to pay her earned wages owed was illegal.

45. Her complaints about unpaid wages that she had earned and were definitely determined by ACI to be owed often boiled over into heated communications between Norton and Webster during the spring of 2020 and leading into May and June 2020.

46. Norton addressed these payment issues primarily with Webster, and at other times with Schlosberg and Gomez. Norton addressed these persistent payment issues in writing and

verbally numerous times. These constant payment issues put a strain on Norton's relationship with Webster and it undermined her faith in him and the company.

47.     In addition to the payment issues, Norton also disagreed with Webster about his position as to how ACI should work with a key vendor called OneStream. Norton felt very strongly about conducting business in a certain manner and Webster disagreed with her. Webster forcefully rejected her recommendations about how to conduct a vital part of the business that she oversaw.[1]

48.     This operational disagreement layered on top of Norton's constant and persistent complaints about payment issues (especially the still raw wound of the unpaid $351,653.75 bonus) all came to a head during the period from June 5, 2020 to June 11, 2020.

49.     On Friday evening, June 5th, Norton and Webster engaged in a heated phone call where the two discussed their disagreement about OneStream. In this phone call Webster made it extremely clear to Norton that she was no longer welcome at ACI.

50.     In the days that followed the June 5th call, Norton stewed over the call. Norton sent a detailed email to Webster on Monday, June 8th, in which she pushed back about the issue with OneStream and the way Webster had treated her in the June 5th call.

51.     On June 11th at 12:48PM, as a last-ditch effort, Norton emailed Webster asking for a group call with a representative from sales to work through challenges. Minutes later, Webster emailed Norton and made it clear to her that the meeting she requested would not happen and he continued to hold his sour view of her.

52.     After their tense email exchange in the middle of the day on June 11th, to the best of Norton's recollection, Norton and Webster spoke briefly again.  The discussion was again,

---

[1] The substance of this operational dispute concerning OneStream is spelled out in further detail in the chain of emails attached as Exhibit B to Defendants' September 24, 2020 Motion to Dismiss.

heated. The call ended with Webster using words that Norton understood to mean that if she did not want to abide by "his rules" then she was "not welcome at his company." It was clear to Norton from the words used by Webster that she was no longer welcome at ACI and she needed to go. At bottom, Webster communicated to Norton very clearly that he no longer wanted her at ACI and he had concluded that her employment at ACI was over.

53. Later that evening at 9:03PM, Norton took a step toward complying with Webster's communications about the end of her employment at ACI. She wrote to Schlosberg and informed him that it had been made clear that she is not viewed as effective in her position by "company leadership" (i.e., Webster) and asked to discuss an exit strategy for her. Within 45 minutes, Webster emailed Norton and demanded her resignation.

54. When Norton awoke the next morning, she discovered that ACI had shut off her computer system access and received an email at her personal email address again demanding her resignation.

55. The sum and substance of the above facts demonstrate that ACI terminated Norton's employment involuntarily. The series of written and verbal communications between parties from June 5th to June 11th all stem from Webster's ongoing frustration with Norton arising from her persistent demands about payments, their dispute about the company's stance concerning OneStream, and frustrations with the sales team not being addressed.

56. Upon information and belief, ACI terminated Norton's employment in retaliation for her constant complaints about the illegality of her unpaid wages.

57. At the time of her discharge, Norton was entitled to be paid out in full her earned and definitely determined bonus wages for 2018, 2019, and 2020 as required by M.G.L. c.149,

§ 148. Together, those amounts total $474,653.75 of unpaid, earned wages ($123,000 for her 2018 Bonus; $301,653.75 for her 2019 Bonus; and $50,000 for her 2020 quarterly bonus).

58. As of the date of filing, ACI made the first payment under the promissory note of $50,000 plus interest at the 5% rate set forth in the note. ACI has not made any other payments to Norton for her earned and unpaid wages, despite Norton's individual efforts to demand that ACI pay her properly.

59. On July 9, 2020, Norton filed a written complaint with the Massachusetts Attorney General ("AG") concerning her unpaid wage claims pursuant to M.G.L. c. 149, § 150 and requested a right to sue letter. The AG issued a right to sue letter on July 10, 2020.[2]

## COUNT I
## Failure to Pay Wages in Violation of M.G.L. c. 149, § 148
**(Against all Defendants)**

60. Norton re-alleges the allegations contained in paragraphs 1 through 59, inclusive, with the same force and effect as if hereinafter set forth at length.

61. Pursuant to M.G.L. c. 149, § 148B, Norton was an employee of ACI under M.G.L. c. 149.

62. M.G.L. c. 149, § 148 requires the timely payment of all earned wages.

63. Section 148 also provides in relevant part: "…and any employee discharged from such employment shall be paid in full on the day of her discharge."

---

[2] Norton is in the process of augmenting her complaint to the AG to add a claim for unpaid commissions to fulfill her statutory notice requirement. The fact that Norton has not yet received a right to sue letter for her late-paid commissions claim does not operate to prevent her from asserting it in this filing. *See* Depianti v. Jan-Pro Franchising Int'l, Inc., 407 Mass. 607 (2013) (requirement to notify AG of Wage Act claim before filing in court is not jurisdictional).

64. By failing to pay Norton the full amount of her earned wages for her 2018 and 2019 Bonuses on the date of her involuntary discharge (June 5, 2020), ACI violated M.G.L. c. 149, § 148.

65. ACI further violated M.G.L. c. 149, § 148 when it failed to pay the full amount of Norton's earned wages for her quarterly 2020 bonus that ACI had notified her she was eligible to receive.

66. ACI further violated the Wage Act when it paid Norton's monthly commission payments late. At a minimum, Norton is entitled to treble the interest associated with these numerous late payments.

67. Defendant Webster is individually liable for the amounts owed to Norton because at all relevant times he was the President and Treasurer of ACI and was a person having the management of ACI within the meaning of the Wage Act, because he controlled, directed, and participated to a substantial degree in formulating and determining the financial policy of ACI. He also is the Registered Agent of ACI.

68. Defendants Gomez and Schlosberg are individually liable for the amounts owed to Norton because at all relevant times they were officers and agents having the management of ACI within the meaning of the Wage Act, because they controlled, directed, and participated to a substantial degree in formulating and determining the policy of ACI.

69. At all times relevant to this action, Gomez was the co-founder and Executive Vice President of ACI. The trio of Webster, Gomez, and Schlossberg were considered to be the company "executive leadership team." At all times relevant to this action, Schlosberg was the Senior Vice President, Operations of ACI and oversaw, among other things, ACI's payroll function including the payment of bonuses and commissions.  As the members of the ACI executive leadership team,

Gomez and Schlossberg routinely participated in the most important decisions that impacted the policies and direction of the company.

70. Defendants' failure to comply with M.G.L. c. 149, § 148 entitles the Norton to recover treble damages, interest, reasonable attorney's fees, and costs pursuant to M.G.L. c. 149, § 150.

**COUNT II**
**Retaliation for Complaints about Non-Payment of**
**Earned Wages in Violation of M.G.L. c. 149, § 148A**
**(Against all Defendants)**

71. Norton re-alleges the allegations contained in paragraphs 1 through 70, inclusive, with the same force and effect as if hereinafter set forth at length.

72. As outlined in detail above, Norton suffered mistreatment during her employment after she complained about non-payment, late payment, or partial payment of wages.

73. Norton's numerous complaints about unpaid, late paid, or under-paid earned wages detailed above were based on her reasonable belief that she should have been paid fully and in a timely manner according to ACI's promises.

74. Upon information and belief, Norton's persistent complaints about non-payment of earned wages were a determinative factor in ACI's decision to terminate her employment.

75. Defendants Webster, Gomez, and Schlosberg are individually liable for the amounts owed to Norton for the reasons set forth in Count I.

76. Defendants' failure to comply with M.G.L. c. 149, § 148A entitles Norton to recover her lost back-pay, lost benefits, treble damages, interest, emotional distress damages, reasonable attorney's fees, and costs.

## COUNT III
## Breach of the Covenant of Good Faith and Fair Dealing
### (Against ACI)

77. Norton re-alleges the allegations contained in paragraphs 1 through 76, inclusive, with the same force and effect as if hereinafter set forth at length.

78. Through the variety of conduct set forth above, ACI has breached the implied covenant of good faith and fair dealing that is implied into all contracts entered into within the Commonwealth of Massachusetts.

79. This misconduct includes all fact allegations set forth above, and is not limited to, ACI's persistent failure to pay Norton fully and in a timely manner, ACI's making of false promises designed to induce her to continue performing services for ACI to her ultimate detriment, failing to provide accurate revenue and cash flow when explaining non-payment or late payment, and terminating her employment shortly before 2020 bonus payments should have been paid.

80. ACI is liable to Norton for all damages that she sustained because of ACI's breach of the covenant of good faith and fair dealing.

## COUNT IV
## Unjust Enrichment/Quantum Meruit
### (Against ACI)

81. Norton re-alleges the allegations contained in paragraphs 1 through 80, inclusive, with the same force and effect as if hereinafter set forth at length.

82. Norton hereby pleads in the alternative, to the extent that it is determined that she has no rights under contract as to any of her claims, that ACI has been unjustly enriched by the misconduct outlined above and Norton is entitled to be paid the fair value of her services.

83. Norton conferred a substantial benefit upon ACI by performing her job duties in such a manner as to generate substantial revenues for ACI.

84. Norton's services were performed with the knowledge of ACI, and ACI benefitted greatly from the revenues that she generated.

85. Through its actions set forth above, ACI encouraged Norton to continue to generate substantial revenues for ACI.

86. Through its actions set forth above, ACI has underpaid Norton for the value of her services performed.

87. It would be inequitable for ACI to retain the benefit of the services Norton provided without paying her fairly and appropriately for those services.

## COUNT V
## Promissory Estoppel
## (Against ACI)

88. Norton re-alleges the allegations contained in paragraphs 1 through 87, inclusive, with the same force and effect as if hereinafter set forth at length.

89. ACI promised Norton that she would be paid an increased based salary for 2020 at the rate of $350,000 (increased from $300,000).

90. ACI also promised Norton that her 2020 bonuses would be earned and be paid quarterly at a fixed rate of $50,000 per quarter.

91. In addition, ACI had promised Norton to pay the remainder that it owed for her 2018 Bonus.

92. ACI knew that Norton had long been frustrated with issues about how the company paid (or failed to pay) her incentive compensation.

93. ACI therefore should have reasonably expected that Norton would rely on its promises of full bonus amount, increased salary, and quarterly bonus payments.

94. ACI's promises did in fact induce Norton to continue working hard for ACI and continuing to generate substantial revenues.

95. ACI did not pay Norton at the promised $350,000 rate until approximately May 2020, thus depriving her of at least four months of a higher rate of pay.

96. ACI never paid Norton any bonuses for 2020.

97. ACI never paid the additional $123,000 that is owed for the 2018 Bonus.

98. Enforcement of ACI's promises is necessary to avoid the injustice Norton has suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Norton respectfully requests that the Court grant the following relief:

1. judgment on Counts I - V;

2. an award of Norton's earned and unpaid wages;

3. an award of Norton's lost wages and benefits during her period of unemployment as well as the difference between her current compensation and her ACI compensation;

4. treble damages of Norton's earned and unpaid wages and her lost wages and benefits during her period of unemployment and statutory interest owed;

5. costs, reasonable attorney's fees, and statutory interest; and

6. such other relief as the Court deems just and proper.

## JURY DEMAND

Norton hereby demands a trial by jury on all claims raised in her Complaint that are so triable.

        Respectfully submitted,

        TAMARAH NORTON,

        By her attorneys,

        */s/ Mark M. Whitney*

        Mark M. Whitney (BBO # 637054)
        Maureen T. DeSimone (BBO # 703358)
        WHITNEY LAW GROUP, LLC
        11 State Street
        Marblehead, MA 01945
        Phone: (781) 631-4400
        E: mwhitney@whitneylawgroup.com
        E: mdesimone@whitneylawgroup.com

Dated: October 19, 2020

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on October 19, 2020.

        */s/ Mark M. Whitney*
        Mark M. Whitney